TENTATIVE RULING

ISSUED BY JUDGE LAURA S. TAYLOR


Debtor:       PEPPERTREE PARK VILLAGES 9 AND 10, LLC

Number:       17-05137-LT11

Hearing:       10:00AM Wednesday, August 4, 2021

Motion:       SECOND MOTION TO EXTEND TIME TO PERFORM UNDER THE
CHAPTER 11 PLAN FILED ON BEHALF OF NORTHERN CAPITAL, INC.,
PEPPERTREE LAND COMPANY, PEPPERTREE PARK VILLAGES 9 AND 10, LLC,
DUANE SCOTT URQUHART


Hear.

Debtors confirmed a Plan in November of 2019. Under its terms, Debtors were given 10 months, until September 15, 2020, to sell or refinance the real property at issue (the "Property") (the "Liquidity Event Deadline"). In its first motion to extend the Liquidity Event Deadline, Debtors asserted a COVID-related slow down at the County Planning Development Services Department ("PDS"), the entity which must ultimately approve Debtors' General Plan Amendment ("GPA") pursuant to which the Property would be rezoned to allow residential building. The first motion was not opposed and was granted; the Court extended the Liquidity Event Deadline nine months to June 15, 2021. Debtors now seek a further extension of the Liquidity Event Deadline to March 30, 2022, over one year after the original Deadline and over two years after confirmation. Once again, they blame the pandemic for delays. This second Motion is opposed.

The Court has several questions and concerns which must be addressed before it will further extend the Liquidity Event Deadline. The Court may be willing to grant a bridge extension to give Debtors an opportunity to provide further information and answers. The Court will likely require a detailed timeline of the steps needed to obtain approval of a GPA and additional valuation information.

**Background**

Under the terms of the Plan, the Court may extend any deadline upon a showing of good cause. Debtors' excuse for failure to comply with the June 15, 2021, deadline is that the entity which must approve Debtors' rezoning efforts, the PDS, has been unable to approve rezoning in the expected time due to COVID-based delays. Debtors also contend that the third-party technical firms and consultants retained by Peppertree Park

to prepare the updated CEQA reports were negatively impacted by the pandemic. The Court generally accepts that COVID is a material, if not singular, reason for the delays.

Two law firms who represented the Debtors pre-confirmation, (the "Administrative Claimants"), with allowed, unpaid administrative claims exceeding $1,000,000.00, filed a joint statement in which they raised several concerns regarding the lack of information provided in support of Debtors' extension motion. They also request imposition of several conditions if the extension is granted, including status reports and the employment of brokers to investigate sale of the Property in lieu of development.

Unsecured creditor Meritage filed an opposition in which it adopted the concerns raised by the Administrative Claimants and also argued that the Motion should be denied for those reasons. Meritage further argues that the Motion should be denied because Debtors' rezoning plan is no longer feasible because the San Diego County Airport Land Use Commission ("ALUC") recently adopted two resolutions, which in combination state that residential development on a portion of the Property is violative of airport safety rules[1]. In summary, the ALUC found that Unit 10 falls within safety Zone 2 of the Fallbrook Community Airport, and that residential development is not permitted. Debtors raise some evidentiary quibbles with this information, but they do not deny the ALUC's most-recent determinations.

**Standards**

Debtors recognize that the Plan does not define what constitutes "good cause" to extend the deadline to sell or refinance the Property and urge the Court to employ the considerations used to determine whether good cause exists to extend the time to serve a complaint under Fed. R. Civ. P. 4(m): (1) whether affected parties have received sufficient notice; (2) whether affected parties would suffer prejudice; and (3) whether the party seeking the extension would be severely prejudiced if an extension was not granted. *See Oyama v. Sheehan (In re Sheehan)*, 253 F.3d 507, 512 (9th Cir. 2001). In this case, the notice element appears irrelevant so the proposed test involves a weighing of prejudices with the Court's thumb somewhat on the scale in favor of the objecting parties: they must establish prejudice while the Debtors must establish. severe prejudice.

Debtors also suggest the "excusable neglect" standard used when a party seeks an extension of time under Fed. R. Bankr. P. 9006(b): (1) whether the requesting party has been diligent; (2) whether there is a genuine need for the continuance; (3) whether the continuance will inconvenience the Court and affected parties; and (4) whether the requesting party will suffer prejudice if the request is denied. *United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir. 1985), amended, 764 F.2d 675 (9th Cir. 1985).

---

[1] The Debtors describe the portion of the Property potentially unavailable for residential development as Parcel 10. The Court will adopt this nomenclature for purposes of this Tentative but notes that it reads the relevant documents as lacking this crispness. But what they clearly say is that the entirety of the Property is not available for residential development in the ALUC's view. The Court uses the Parcel 9 versus Parcel 10 description merely to make a generalized point that according to the ALUC the entire Property cannot be overbuilt with homes.

Neither the Administrative Claimants nor Meritage have weighed in on the standard. While the Court may consider these standards, they are not specifically applicable and may or may not be helpful. The Court will read "good cause" in the Plan in the general sense suggested by all such standards: is there a good reason to extend the stay and will it benefit or injure parties in interest? Where there are countervailing benefits and injuries, the Court will weigh them keeping in mind the context of this decision, the impact on the bankruptcy process, public policy considerations, and other case specific factors that the Court deems relevant. Here factors likely to prove of significant weight include the feasibility of the extension (will it allow finalization of a rezoning of the Property or otherwise allow completion of the entitlement process within its time frame), the relative prejudice to the parties, and whether Debtors have provided sufficient information for the Court to make such a decision. With those general thoughts in mind, the Court analyzes the issues as follows:

**Prejudice to Creditors**

The only creditors to weigh in are the Administrative Claimants and Meritage.

### The Administrative Claimants

The Administrative Claimants did not formally oppose the extension but rather raised concerns and requested conditions.

### Meritage

Meritage opposes the extension. In the reply, Debtors assert that Meritage would not be prejudiced by any delay because its claim is not yet liquidated, and Meritage will not be entitled to payment until long after the extended Liquidity Event Deadline. As the Court reads Debtors' Plan, Meritage, as a holder of a "Known Disputed Unsecured Claim" of Class 6, was to have received a "Class 6 Promissory Note… under which the applicable Reorganized Debtor shall be obligated to pay the full amount of the Allowed Class 6 Claims on or before the Liquidity Event Deadline." Dkt. No. 574. So, an extension is detrimental to Meritage if it delays payment through any source including liquidation. The Debtors and Meritage should be prepared to discuss.

**Is there a worthwhile benefit to allowing additional time to re-zone the Property?**

A major theme in the Motion is that re-zoning the Property will allow the Debtors to pay all creditors in full, while selling the Property "as is" will not. This assertion, however, does not appear to be supported by recent evidence nor does it appear to take fully into account the recent resolutions of the ALUC.

### The Airport Safety Zone Issue

In the Motion filed on June 14, 2021, Debtors casually mentioned that: "[i]t is possible that PDS will request the Airport Land Use Commission for an updated consistency determination." Dkt. No. 742. In fact, it was far more than possible: the

PDS had already made the request as reflected in the April 6, 2021, Letter to the Planning Commission. See Ex. 8 to the Temple Declaration, Dkt. No. 750-1.[2]

As discussed above, on July 1, 2021, after Debtors filed this motion, the ALUC adopted two resolutions which prohibit residential development in the portions of the Property that fall within Safety Zone 2 of the Fallbrook Community Airport. As noted, Debtors describe the area impacted as Unit 10:

> The ALUCP identifies residential use located within Safety Zone 2 as incompatible with airport uses and does not allow residential uses to be considered as permissible…

Dkt. No. 750-1, Ex. 2. While Debtors can, in effect, go over the ALUC's head, the project as contemplated in Debtors' Plan is not feasible.

Debtors respond that they are now pursuing approval of two alternative Scenarios: Scenario 1, which contemplates only corporate use on Unit 10; and Scenario 2 which retains the residential use on Unit 10 despite the resolutions of the ALCU. Debtors concede that for Scenario 2 to be approved, the San Diego County Board of Supervisors would have to override the unanimous resolutions of the ALCU by a two-thirds vote. The Court is not inclined to grant an extension of the Liquidity Event Deadline based on Debtors' mere hope that the resolutions will be overturned. Without further evidence the Court will act on the assumption that the only viable option for the Debtors is Scenario 1, which raises additional questions.

### Is Scenario 1 sufficiently developed to seek approval?

What else is needed other than the high-level site plan? See Ex. A to the Reply, Dkt. No. 755-1. And what do Debtors intend? Will they explore this option immediately or will they continue to pursue both options? Debtors should be prepared to explain.

### Is re-zoning under Scenario 1 worth the delay?

In the Motion, Debtors contend that the Plan always contemplated final approval of the GPA by the County before the sale or refinance of the Property.  This, however, is not so clear.  In the Motion to Confirm, Debtors explained that "[n]o further reorganization is likely to be necessary although the Plan does provide for an orderly liquidation in the event the Liquidity Event is not achieved." Dkt. No. 601.  The Plan provides:

> In the event a Default occurs by reason of failure of the Liquidity Event to occur prior to the Liquidity Event Deadline, unless the Court orders otherwise upon good cause shown by the Reorganized Debtors after notice to creditors and

---

[2] Debtors raised evidentiary objections to the documentary evidence provided by Meritage with respect to the status of the airport issues.  This is Debtors' motion, and it is Debtors' burden to show good cause for the extension.  Do Debtors really want to argue that the resolutions were not made or do not say what they say? Isn't the hearsay exception for records of regularly conducted activities applicable here?  The Court will hear argument on this point, but it is not inclined to ignore the activities of a governmental body as set forth in a public document.

a hearing, Peppertree Park 9 & 10, LLC, PLC, and NCI will promptly and, in no event later than December 31, 2020, seek Court approval to sell substantially all assets of such Debtors' estates and distribute the proceeds in accordance with the Bankruptcy Code….

If the status report reports that the Liquidity Event is not likely to occur, Peppertree 9 & 10, LLC will proceed with the sale of the Property at the highest achievable price, to close by December 31, 2020, and distribute the proceeds in accordance with the Bankruptcy Code.

Dkt. No. 574.  The idea that the Property would have to be liquidated without rezoning is not new.

As noted, the underlying reason for Debtors' request for extension is that creditors will be paid in full if the Properties is sold or refinanced once rezoning is approved, but they will not be so paid if it is sold or refinanced "as is."  And the Court understands that the Debtors want to get the rezoning approved before selling or liquidating the Property.  In light of the passage of time and the airport resolutions, however, it is not clear that rezoning makes a difference from the perspective of creditors and, thus, would be worth the delay.

The appraisal report Debtors relied on in support of the motion to confirm valued the Property at $7.4 million (as of October of 2018) without any rezoning and $13,870,000.00 as of June 30, 2019, if rezoning was allowed to build 119 residential units.  See Dkt. No. 608-2.  The Court questions whether these values are still valid.

One question is whether the value of the Property without rezoning has increased? If so, there may be little or no benefit to delay from the perspective of creditors. Increased value could be the result of general market appreciation, and the additive value of any progress towards rezoning could also increase value. The Court is uncomfortable assuming that a 2018 valuation has any validity.

Also, in light of the current status quo, the entirety of the Property is not available for residential development, the $13,870,000 as rezoned value (or more aptly the $5.47 million increase in value as a result of rezoning) is subject to question. In scenario 1, the increase may be far less. And the cost and time-delay in achieving this value should be considered in any such analysis. The Court is not willing to blindly assume that the stale valuation information remains valid.

And there is another troubling issue, the cost of this additional development effort and the risk that the post-petition lender will foreclose when its loan comes due prior to termination of the requested extension period. Debtor's glib assertions that it has approximately $90,000, and its apparent assumption that the current lender can be dealt with fail to satisfy the Court.

**Retention of a Broker**

The Administrative Claimants request employment of a broker, and Meritage agrees. Debtors resist, despite the fact that this was expressly contemplated in the Plan which provides:

> Peppertree 9 & 10, LLC intends to retain a recognized broker with national reach to begin marketing the Property on a "when entitled" basis. Such effort will begin after the Effective Date and the marketing effort will have as its purpose achieving the Liquidity Event. If, however, that proves impossible for whatever reason, then the Property will be sold on or before December 31, 2020 after notice and hearing before the Bankruptcy Court and subject to the Bankruptcy Court's approval.

Dkt. No. 574. The Court is unlikely to grant an extension unless Debtors employ a broker to be prepared to sell the Property "as is" in the event the Liquidity Event Deadline, as extended, is not met. Debtors moan about the related cost, but the cost may be well-worth it.

**Plan Funding Loan**

After some cajoling from the Court, Debtors have provided evidence that the $3,600,000 loan from G.F. Capital Group (the Plan Funding Loan), has been extended through December 27, 2021. This is short of the March 2022 target date, which is problematic. Debtors do not explain how the Plan Funding Loan will be paid if the Liquidity Event Deadline is not achieved before December 27, 2021. Debtors opine that they have enough funds to complete the process, and they say that they are pursuing additional funding, but as already noted the Court requests more concrete information.

**The Morro Hills Property**

As to the Morro Hills Property, Debtors now contend that sale of the Property is not worthwhile as it will only generate $71,000.00, while Mr. Urquhart will be able to refinance and generate $150,000.00, but not until December. The Court will hear argument on this point.

**Mr. Urquhart's Draws**

If Mr. Urquhart has not already ceased taking payments for this process, an extension will likely be conditioned on payments ending immediately.

**Conclusion**

Debtors seek an extension of the Liquidity Event Deadline from the original 10 months to nearly 2 and a half years. They blame COVID. While the Court assumes the pandemic had significant negative impact on the rezoning effort, the problem now, at least in part, is unrelated to COVID. Put bluntly, unless something changes, the Debtors can't develop the entirety of the Property as they desired. The Court acknowledges that this may change, but it is far from a minor bump in the road. Debtors should be prepared to provide a detailed timeline of what needs to happen to finalize the rezoning and anticipated dates for each step. The Court will hear argument,

and may grant an extension to allow Debtors to provide this information. Debtors should also provide updated valuation information or advise as to when it can be obtained. Other conditions also may govern any extension.