Leslie T. Gladstone, Esq.  (SBN 144615)
Christin A. Batt, Esq.  (SBN 222584)
FINANCIAL LAW GROUP
5656 La Jolla Blvd.
La Jolla, CA 92037
Telephone:  (858) 454-9887
Facsimile:  (858) 454-9596
E-mail:  ChristinB@flgsd.com

Attorneys for Gerald H. Davis, Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| In re: | Lead Case No.:  17-05137-LT7 (Jointly Administered) |
|---|---|
| PEPPERTREE PARK VILLAGES 9 & 10, LLC, <br><br> Debtor. | **TRUSTEE'S STATUS REPORT** <br><br> Date:        September 20, 2023 <br> Time:        2:00 p.m. <br> Dept:        Three (3) <br> Honorable Laura S. Taylor |
| PEPPERTREE PARK VILLAGES 9 & 10, LLC, <br>         Case No. 17-05137-LT7 <br><br> PEPPERTREE LAND COMPANY, <br>         Case No. 17-05135-LT7 <br><br> NORTHERN CAPITAL, INC. <br>         Case No. 17-04845-LT11 <br><br> DUANE SCOTT URQUHART, <br>         Case No. 17-04846-LT11 <br><br>         Debtors. | |

Gerald H. Davis, the chapter 7 trustee (the "**Trustee**") of Peppertree Park Villages 9 & 10, LLC ("**Property Owner**") and Peppertree Land Company ("**PLC**"), submits this Status Report regarding the Status Conferences in the cases of Property Owner and PLC, the four pending motions for approval of chapter 11 administrative claims in Property Owner's case, and

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

the pending matters in the related cases of Northern Capital, Inc. ("**NCI**"), and Duane Scott Urquhart.

## PROPERTY OWNER'S CASE

The sale of Property Owner's real property and related development applications closed on August 15, 2023.  NCI's appeal of the Settlement Order has been dismissed, and PLC's appeal of the Sale Order has been dismissed.

The Trustee anticipates that, after deduction of chapter 7 administrative expenses (which cannot yet be determined with precision[1]), the estate may have approximately $275,000.00 available to pay allowed chapter 11 administrative claims.  The Trustee hopes that this estimate may be helpful to the Court and creditors in determining/resolving the objections to the chapter 11 administrative claims.

Barring any unforeseen issues, the Trustee is preparing to move toward closure of the case and distribution of the estate as soon as the chapter 7 and chapter 11 administrative claims are determined.

## PLC'S CASE

The Trustee called the initial PLC Section 341(a) meeting of creditors on September 6, 2023, via Zoom.  Unfortunately, the Trustee was unable to question PLC's representative Duane Urquhart because PLC's counsel did not appear at the creditors' meeting.[2]  The Trustee, therefore, had to continue the creditors' meeting to October 12, 2023, without sworn testimony.

In reviewing PLC's bankruptcy schedules, the Trustee learned that in November 2017 PLC filed an amended Schedule A/B listing "Ownership interest Peppertree Lane LLC 100%" that has an estimated fair market value of "$0.00."  (Case No. 17-05137-LT7, ECF No. 91)  Shortly after the Trustee's appointment in PLC's case, the Trustee's counsel requested information regarding Peppertree Lane LLC.  In response, PLC's counsel promptly delivered

---

[1] The Trustee's counsel has not yet prepared its application for compensation in Property Owner's case, but we expect to do so soon.  Decisions regarding billing judgment and the amount allowed by the Court will affect this calculation.

[2] No explanation has been provided to the Trustee regarding counsel's failure to appear.

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

the Peppertree Lane LLC Operating Agreement, effective as of July 1, 2002, and the First Amendment to Operating Agreement, effective as of May 1, 2006 (collectively, the "**Operating Agreement**").  A true and correct copy of the Operating Agreement provided by PLC's attorney Will Farmer is attached hereto as <u>Exhibit A</u> and incorporated herein.

The Trustee has two immediate concerns:  (1) the Operating Agreement provides that PLC and NCI possess assets that are either not disclosed or substantially undervalued in their respective bankruptcy schedules, and (2) the Trustee was unable to question Mr. Urquhart under oath at the September 6 Section 341 creditors' meeting regarding these discrepancies.

Specifically, the Operating Agreement provides that NCI is the Development Member of Peppertree Lane LLC and has a 40% Profits Percentage in the company.  Operating Agreement opening paragraph & ¶ 4.1.1.  In addition, the Operating Agreement provides that Peppertree Lane LLC owns certain real property commonly known as Assessor's Parcel Number 106-041-37-00, consisting of approximately four acres of vacant land located in Fallbrook, California.  Operating Agreement ¶ 3.2.  The stated purpose of the company is to seek approval of a final subdivision map for the property to develop at least four single family detached residential lots and related improvements.  Operating Agreement ¶ 3.2.  According to the Operating Agreement, PLC and two individuals (Roland T. Morosetti and Arlene L. Morosetti) own the other 60% Profits Percentage of the company.[3]  Operating Agreement opening paragraph & ¶ 4.1.2(iii).

The Trustee obtained a preliminary report from Ticor Title Company that shows the 4.16-acre parcel is still owned by Peppertree Lane LLC and is not encumbered by any lien.

The Operating Agreement and, specifically, the First Amendment, provides that the Morosettis may unilaterally dissolve the company within 90 days after expiration of the "Map Period," which is defined as 60 months after the Operating Agreement is executed.  First Amendment ¶ 2.  The Operating Agreement was entered effective as of July 1, 2022.  The Map

---

[3] According to the Operating Agreement, this 60% Profit Percentage is divided between PLC and the Morosettis after calculating PLC's future contributions to the entitlement expenses of the company.  The Trustee is without sufficient information to perform such calculation.

Period, therefore, ended on July 1, 2007 (60 months after the effective date of the Operating Agreement), and the 90-day deadline after expiration of the Map Period was September 29, 2007.  It would appear that the Morosettis did not exercise their dissolution power before the September 29, 2007 deadline because the company continues to exist as owner of the vacant land and as stated in PLC's 2017 amended Schedule A/B.

The Trustee has no information at this time regarding the possible value of this undeveloped land.  However, PLC's statement that Peppertree Lane LLC has $0 value is obviously misleading.

Given NCI's failure to disclose its interest in Peppertree Lane LLC and the fact that the Trustee may require NCI's cooperation in monetizing PLC's interest in Peppertree Lane LLC, *the Trustee requests that NCI's bankruptcy case not be dismissed at this time*.

The Trustee believes that his investigation in PLC's case will have no effect on case closure and distribution in Property Owner's case.

Respectfully submitted,

Dated:  September 13, 2023        FINANCIAL LAW GROUP


By:    /s/ Christin A. Batt
        Christin A. Batt, Esq.
        Attorneys for Gerald H. Davis, Trustee

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California  92037

# Exhibit A

# Exhibit A

# PEPPERTREE LANE LLC

# OPERATING AGREEMENT

PEPPERTREE LANE LLC

OPERATING AGREEMENT

This agreement ("Agreement") is entered into effective as of __July 1.__, 2002 by Northern Capital, Inc., a California corporation (the "Developer Member") and Peppertree Land Company, a California general partnership and Roland T. Morosetti and Arlene L. Morosetti (collectively, the "Investor Members").

1.    COMPANY FORMATION AND IDENTIFICATION.

1.1    Name.  The name of the limited liability company ("LLC") governed by this Agreement (the "Company") is Peppertree Lane LLC.

1.2    Formation.  Articles of Organization ("Articles") for the Company were filed with the California Secretary of State on __7/29/02__ (the "Organization Date").

1.3    Principal Executive Office.  The principal executive office of the Company shall be at 5256 S. Mission Road, #905, Bonsall, California until changed by the Manager.

1.4    Agent For Service of Process.  The initial agent for service of process of the Company shall be Duane S. Urquhart, until changed by the Manager.

2.    DEFINITIONS.

The following terms used in this Agreement shall have the following meanings, unless expressly provided otherwise:

2.1    "Affiliate" means any person directly or indirectly controlling, controlled by or under common control with another person.

2.2    "Allocations" means a person's share of the net income, gains, net losses, and similar items, for income tax purposes, of the Company.

2.3    "Bankrupt" or "bankruptcy" means, with respect to any person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

2.4    "Company property" means all assets and properties of the Company of any and all kinds, tangible and intangible.

2.5    "Distribution" means the transfer of money or property by the Company to its Members without consideration.

2.6    "Economic interest" means a person's right to share in the allocations of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management or, except as provided in Section 17106 of the LLC Act, any right to information concerning the business and affairs of the Company.

2.7     "Investor Interests" shall mean the class of Membership Interests issued to Investors, with the rights and obligations described in this Agreement.

2.8     "IRC" means the Internal Revenue Code of 1986, as amended, or any successor provisions.

2.9     "LLC Act" means Title 2.5, Sections 17000 et seq., of the California Corporations Code, or any successor provisions.

2.10    "Manager" means a person elected by the Developer Member to manage the Company in accordance with the LLC Act.

2.11    "Managing Interests" means the class of Membership Interest issued to the Developer Member, with the rights and obligations described in this Agreement.

2.12    "Member" means a person who has (i) been admitted to the Company as a member in accordance with this Agreement, or an assignee of a Membership Interest in the Company who has become a member pursuant to this Agreement; and (ii) not resigned, withdrawn, or been expelled as a member or, if other than an individual, been dissolved.

2.13    "Membership Interest" means a Member's rights in and obligations to the Company, including the Member's economic interest, any right to vote or participate in management, and any right to information concerning the business and affairs of the Company provided by the LLC Act. There shall be two classes of Membership Interests, the Managing Interest and Investor Interests.

2.14    "Officer" means any person elected or appointed as an officer of the Company pursuant to Section 17154 of the LLC Act.

2.15    "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity.

2.16    "Profits Percentages" means, initially, as provided in Section 4 below. Profits Percentages shall be adjusted upon the transfer, issuance or redemption of a Membership Interest or as otherwise provided in this Agreement or by operation of law.

2.17    "Unreturned Capital" means an amount equal to the capital contribution made with respect to an Investor Interest, less the cumulative amount of all distributions made with respect to such Investor Interest under subparagraph 5.1.1 below.

## 3.     POWERS, PURPOSE AND ORGANIZATION.

3.1     General. The Company shall have the power and authority to engage in all activities which an LLC may legally engage in under applicable law, including the powers described in Section 17003 of the LLC Act.

3.2     Property. The purpose of the Company is to acquire, develop, sell and otherwise deal with the real property commonly known as Assessor's Parcel Number 106 - 041 - 37 -00 consisting of approximately 4 acres, located in the Community of Fallbrook, in the County of San Diego, California (the "Property"). The Company intends to seek approval of a final subdivision map ("Final Map") for the Property, to permit subdivision and development of the Property into at

least four single family detached residential lots and related streets and facilities, constructing single family residences and related improvements on such lots and offering such single family residences for sale (the "Project"). The Company is authorized to take such action as may be necessary or appropriate to acquire the Property and to otherwise proceed with the Project.

3.3    Financing of Project. The Company intends to finance the Project by obtaining a construction loan for up to 75% of the projected appraised value of the project.

4.    CAPITALIZATION.

4.1    Equity.

4.1.1    Developer Member's Initial Capital Contribution. The Developer Members shall contribute all past efforts and services in connection with the formation of the Company. In exchange for such contribution the Developer Member shall receive a 40% Profits Percentage.

4.1.2    Investors' Initial Capital Contributions.

(i)    Peppertree shall contribute such cash as may be required to process entitlements for the Project and shall receive credit to its capital account for the actual amount contributed. Peppertree and the Company shall from time to time upon the request of Morosetti provide to Morosetti a written summary and reasonable supporting documentation for such contributions.

(ii)    Morosetti shall contribute the Property to the Company and shall receive an initial credit to their capital account of $100,000; provided, however, such amount shall be adjusted to an amount equal to $25,000 per buildable lot provided on an approved tentative subdivision or parcel map, but in no event less than $100,000.

(iii)    In exchange for such contributions the Investor Members shall collectively receive a 60% Profits Percentage, divided between them based on the final amount of their capital contributions (i.e., if the Project is ultimately approved for six lots, and Peppertree contributes $75,000 in cash to the Company, then Morosetti would receive a Profits Percentage of 40% and Peppertree would receive a Profits Percentage of 20%).

4.2    Loans.

4.2.1    Construction Loan. The Company is authorized to obtain a construction loan to finance the Project, in an amount up to 75% of the appraised value of the Project, from a bank or other lender designated by Manager (the "Construction Lender"). The Construction Loan may be secured by a first trust deed encumbering the Property and the Project.

4.2.2    Other Loans. The Company may from time to time borrow such amounts from such persons (including the Members or their affiliates) on such security and payable on such terms as may be approved by the Managers. The amount of any loan from a Member shall not increase the capital account of the lending Member. The amount of any such loan shall be a debt due from the Company to such lending Member, repayable on such terms and bearing interest at a rate agreed on by the lending Member and the Company, or if no rate is agreed on then at the maximum rate permitted by law. No Member shall be obligated to make any loans to the Company.

5.    DISTRIBUTIONS.

5.1    Priority.  Distributions shall be made from time to time as follows:

5.1.1    First to the holders of Investor Interests until they have received distributions equal to 10% per annum (cumulative but not compounded) on the Investors' Unreturned Capital outstanding from time to time (the "Investor Preferred Return").

5.1.2    Next to the holders of Investor Interests until they receive distributions equal to their Unreturned Capital.

5.1.3    Thereafter, 60% to the Investor Members and 40% to the Developer Member.

5.2    Division of Distributions to Investors.  All distributions to the holders of Investor Interests shall be divided between such holders based on their respective Profits Percentages.

5.3    Authority.  The Manager shall from time to time determine the amount and timing of all distributions.

5.4    Limitations on Distributions.  No distributions shall be made in contravention of Section 17254 of the LLC Act.  No Member shall be entitled to receive distributions from the Company other than as provided in this Agreement.

6.    ALLOCATIONS.

6.1    Allocation of Income, Gains, Losses, Deductions and Tax Credits. All income, gains, losses, deductions, tax credits and similar items of the Company shall be allocated from time to time as follows:

6.1.1    Net loss shall be allocated:

(i)    First, to the holders of all Membership Interests, in reverse order of the net income and gain allocated pursuant to subparagraph 6.1.2 below, up to the amount of cumulative net income and gain so allocated, less any amount of net loss previously allocated pursuant to this item (i).

(ii)    Next, to the holders of Investor Interests (pro rata based on capital contributions) until the holders of Managing Interests have received allocations of net loss equal to their Unreturned Capital, less any amount of net loss previously allocated pursuant to this item (ii).

(iii)    Thereafter to the holders of all Membership Interests pro rata based on their respective Profits Percentages.

6.1.2    Net income and gain shall be allocated:

(i)    First, to the holders of all Membership Interests in reverse order of the net loss allocated pursuant to subparagraph 6.1.1 above, up to the amount of cumulative net

loss so allocated, less any amount of net income or gain previously allocated pursuant to this item (i).

(ii)    Next, to the holders of Investor Interests (pro rata based on capital contributions) until the holders of Investor Interests have received allocations of net income and gains equal to the then accrued Investor Preferred Return, less any amount of net income or gain previously allocated pursuant to this item (ii).

(iii)    Thereafter to the holders of all Membership Interests pro rata based on their respective Profits Percentages.

6.1.3    The Managers may make reasonable adjustments to the allocations set forth in this Section 6, based on the advice of the Company's accountant, to fairly allocate such items to the Members in accordance with their Membership Interests.

6.2    <u>Net Income, Gain and Net Loss</u>.  The net income, gain and net loss of the Company shall be computed at the end of each fiscal year in accordance with federal tax accounting principles, consistently applied, and shall be allocated among and credited to or debited against the capital accounts of the Members.  The terms net income, net loss, income, gains, losses, deductions and tax credits shall refer to and be defined as those terms are used and defined for federal income tax purposes.

6.3    <u>Allocation Overrides</u>.

6.3.1    Items of income, gain, loss and deduction with respect to property contributed by a Member to the Company shall be allocated to the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, in accordance with IRC Section 704(c) and Treasury Regulations promulgated thereunder.

6.3.2    No loss or deduction shall be allocated to any Member if, or to the extent, such allocation would create or increase a deficit in such Member's capital account (adjusted as required by Treasury Regulations Section 1.704-1(b)(4)(iv)) as of the end of the Company taxable year to which such allocation relates, unless such allocation of loss or deduction is attributable to nonrecourse debt of the Company and otherwise satisfies the requirements of Treasury Regulations Section 1.704-1(b)(4)(iv).

6.3.3    If a Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) (4), (5) or (6), which result in a deficit balance in such Member's capital account, Partnership income and gains shall be specially allocated to such Member in an amount and manner sufficient to eliminate, as quickly as possible, such deficit created by such adjustments, allocations or distributions.

6.3.4    If any allocations of income, gains, losses or deductions are made to Members under the allocation overrides set forth above, income, gains, losses and deductions shall subsequently be allocated in a manner which most quickly results in the allocations made under this subparagraph offsetting the effect of the prior allocation overrides, such that the Members' capital accounts are returned to the balances which would have existed absent the allocation overrides; provided, however, allocations under this subparagraph shall also be subject to the allocation overrides set forth above.

6.4    Savings Clause. The tax allocations set forth in this Section 6 are intended to be consistent with the interests of the Members in the Company and to comply with the requirements of IRC Section 704(b). If such tax allocations do not accomplish that objective, they shall be modified to the extent reasonably necessary to accomplish that objective.

7.    CAPITAL ACCOUNTS.

7.1    Capital Account Maintenance. An individual capital account shall be maintained for each Member, in accordance with applicable Treasury Regulations. Subject to such requirement, each Member's capital account shall consist of such Member's initial capital contribution (i) increased by any additional capital contributions (valued at fair market value) and such Member's share of net income and gains; and (ii) decreased by any distributions and its share of net loss.

7.2    Book-up on Revaluation of Company Property. The Members' individual capital accounts may be increased or decreased to reflect the revaluation of Company property on the Company's books upon the occurrence of those events described in applicable Treasury Regulations. This adjustment shall be made in the manner described in applicable Treasury Regulations.

7.3    Distribution of Property and Constructive Termination. If Company property other than cash is distributed to a Member in liquidation of the Company, capital accounts shall be adjusted for the hypothetical gain or loss that would have been realized by the Company if such property had been sold for cash, to reflect unrealized gain or loss. Capital accounts may also be adjusted upon the constructive termination of the Company as provided in IRC Section 708, as required by applicable Treasury Regulations.

7.4    Target Capital Accounts. The tax allocation provisions of this Agreement are intended to produce final capital account balances ("Target Capital Accounts") which reflect the distribution provisions set forth in Section 6. To the extent that the tax allocation provisions of this Agreement would not produce such Target Capital Accounts, then income, gains, losses, deductions, tax credits and similar items shall be allocated in a manner which produces such Target Capital Accounts; and, if necessary, prior tax returns shall be amended to reallocate such items to produce such Target Capital Accounts.

8.    OTHER FINANCIAL MATTERS.

8.1    Fiscal Year. The fiscal year of the Company shall be the calendar year.

8.2    Accounting Method. The Company's books shall be kept on a cash basis in accordance with sound accounting principles consistently applied.

8.3    Tax Matters Partner. The Developer Member shall be the "Tax Matters Partner" for purposes of IRC Sections 6221-6232. The Tax Matters Partner shall have the right to exercise the powers and assume the responsibilities set forth in the applicable provisions of the IRC and related regulations.

8.4    Other Elections. The Company shall have the right, as determined by the Managers, to make any other elections or determinations required or permitted for federal or state income tax or other tax purposes.

8.5     Books and Records. The Company shall maintain at its principal executive office the books and records required by Section 17058 of the LLC Act. Members shall have the right to obtain, or to inspect and copy, those records described in Section 17106 of the LLC Act.

8.6     Tax Information. Within ninety (90) days after the end of each fiscal year, the Company shall cause to be prepared and sent to each Member or assignee such tax information and statements as shall be necessary for the preparation by such person of its federal and state income tax returns.

8.7     Bank Accounts. The Company shall maintain a checking account in the name of the Company at a bank or other financial institution (and with signatories) approved by the Managers. Additional accounts of the Company may be authorized by the Managers. All funds of the Company shall be maintained in such account(s).

8.8     Organization Expenses. The Company shall pay or reimburse the Members for all organizational expenses of the Company, including legal fees and costs incurred in connection with formation of the Company.

9.      MANAGEMENT.

9.1     Managers. The Company shall have one Manager. The business and affairs of the Company shall be managed by or under the authority of the Manager. The Manager shall have full power and authority to act on behalf of the Company, including without limitation the power and authority to execute grant deeds, promissory notes, deeds of trust and other instruments and documents on behalf of the Company. The Manager may from time to time, in writing, delegate authority to one or more officers, to act on behalf of the Company in specified matters, including without limitation the power and authority to execute documents on behalf of the Company (including without limitation grant deeds, promissory notes, deeds of trust and other instruments).

9.2     Appointment and Removal of Manager. The Manager shall be elected and may be removed, from time to time by the Developer Member. The initial Manager shall be Duane Urquhart.

9.3     Expenses. The Manager shall be reimbursed by the Company for all direct expenses incurred on behalf of the Company, subject to appropriate documentation and such policies as may be adopted by the Manager.

9.4     No Exclusive Duty. The Manager shall not be required to devote all or substantially all of his time or efforts to the management of the Company. There is no limitation on the outside interests or activities of the Manager. The Manager may have other business interests and may engage in other activities, whether or not such activities or interests are competitive with the Company, without any obligation to offer any interest in such interests or activities to the Company or any Member. Neither the Company nor any Member shall have any right to share or participate in any other business interests or activities of a Manager and each Member waives and releases any right to share or participate in any such interests or activities.

9.5     Member's Authority. No Member shall, acting solely in the capacity of a Member, be an agent of the Company, nor have any authority to bind or act for, nor execute any instrument on behalf of, the Company.

9.6     <u>Arrangements with Members</u>. A Member may transact business with the Company and, subject to other applicable law, has the same rights and obligations with respect thereto as a person who is not a Member. If and to the extent approved by the Manager, the Company may enter into transactions or agreements with the Members (or their affiliates); provided, the terms of any such arrangements shall be no less favorable to the Company as are available from unaffiliated persons.

9.7     <u>Development/Management Fee</u>. If the Property is developed by Company, Company shall pay Developer Member a fee in roughly equal monthly installments over the estimated life of the Project, not to exceed 5% of the estimated Project sales revenues. Such fee shall be paid from the Construction Loan proceeds.

## 10.    MEETINGS AND VOTING OF MEMBERS.

10.1     <u>Voting Rights</u>. Members shall have the right to vote on only those matters required by law or as expressly provided in this Agreement. On those matters on which the Members are entitled to vote, Members shall vote in accordance with their Profits Percentage. Except as otherwise provided in this Agreement, whenever the approval of the Members is required, such approval shall be by the vote of Members holding a majority of the Profits Percentage.

10.2     <u>Rules and Procedures for Meetings and Voting</u>. The rules and procedures for meetings and voting of Members shall be as set forth in Section 17104 of the LLC Act.

## 11.    OUTSIDE INTERESTS.

11.1     <u>Outside Interests</u>. There is no limitation on the outside interests or activities of any Member. Any Member may have other business interests and may engage in other activities, whether or not such interests or activities are competitive with the Company, without any obligation to offer any interest in such interests or activities to the Company or any Member. Neither the Company nor any Member shall have any right to share or participate in any other business interests or activities of any Member or its affiliates, and each Member hereby waives and releases any right to participate in any such interests or activities.

11.2     <u>Outside Activities</u>. Each Member shall indemnify, defend, protect and hold the Company and the other Members harmless from and against all claims, losses and liabilities, including attorneys' fees and costs, incurred as a result of any activity or liability of such Member not associated with and outside the scope of the business and purpose of the Company.

## 12.    LIABILITY AND INDEMNITY.

12.1     <u>Liability of Members</u>. Except as provided in Section 17254 of the LLC Act, no Member shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability, of the Company, whether that debt, liability or obligation arises in contract, tort or otherwise, solely by reason of being a Member of the Company.

12.2     <u>Liability of Managers</u>. No person who is a Manager shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that debt, liability or obligation arises in contract, tort or otherwise, solely by reason of being a Manager of the Company.

12.3    <u>Indemnity of Members</u>. The Company shall indemnify, defend, protect and hold the Members (and their respective directors, officers, partners and other agents and representatives) harmless from and against all claims, losses and liabilities, including attorneys' fees and costs, incurred in connection with Company matters, unless such claims, losses or liabilities arise out of bad faith or wilful misconduct by the Member.

12.4    <u>Indemnity of Manager</u>. The Company shall indemnify, defend, protest and hold the Manager harmless from and against all claims, losses and liabilities, including attorneys' fees and costs, incurred in connection with Company matters, unless such claims, losses or liabilities arise out of bad faith or wilful misconduct by the Manager.

12.5    <u>Tax Matters Partner</u>. The Company shall indemnify, defend, protect and hold the Tax Matters Partner harmless from and against all claims, losses and liabilities, including attorneys, accountants and experts fees and costs, incurred in acting as the Tax Matters Partner during or after expiration of the term of the Company.

13.    <u>TRANSFER OF INTERESTS AND WITHDRAWAL</u>.

13.1    <u>Approval Required</u>.

13.1.1 Except as otherwise provided in this Agreement, no Member shall transfer such Member's Membership Interest without the approval of the Manager, and no purported transfer, whether voluntary, involuntary or by operation of law, shall be effective without such approval. Such approval may be given or withheld in the sole discretion of the Manager Member. The Manager may require satisfaction of such conditions and may require such undertakings as the Manager deems necessary or appropriate in connection with any proposed transfer of a Membership Interest.

13.1.2 Paragraph 13.1.1 shall not apply to a transfer of a Membership Interest by a Member to (i) any other Member, (ii) such Member's heirs, upon the death of such Member, or (iii) a revocable trust established by an individual Member, and of which all of the principal beneficiaries consist of such Member and/or such Member's heirs, provided such Member is the sole trustee or a co-trustee of such trust, and the trustees of such trust agree to be bound by this Agreement; any transfer by such trust, other than a transfer to the Member who created the trust, shall be subject to the terms of this Agreement.

13.2    <u>Right of First Refusal</u>. If an Investor Member (the "Transferring Member") desires to sell, exchange, encumber or otherwise transfer (a "Transfer") any or all of such Member's Membership Interest, or any right or interest therein (the "Transferring Interest"), such Member shall first provide written notice ("Notice of Transfer") to the other Investor Member. Such Notice of Transfer must identify the proposed transferee, the Transferring Interest, and all of the terms of the Transfer, including without limitation (as applicable) the consideration for the Transfer and the terms of payment, and be accompanied by a copy of all written agreements between the Transferring Member and any proposed transferee, and other documents, relating to the proposed Transfer. The Investor Member shall then have the exclusive right, for a period of 30 days after receipt of the Notice of Transfer, to acquire the Transferring Interest on the same terms and conditions as set forth in the Notice of Transfer; such option shall be exercised by delivering written notice of exercise to the Transferring Member within such 30-day period. If either Investor Member exercises such option, then such Investor Member shall then be obligated to acquire, and the

Transferring Member shall obligated to transfer, the Transferring Interest on the same terms and conditions as provided in the Notice of Transfer.

13.3   Non-Exercise of Rights of Refusal. The Transferring Interest specified in a Notice of Transfer and not purchased by the Investor Member may be sold or transferred at any time within 90 days from the date of such notice, to the transferee named and on the terms an conditions specified in the Notice of Transfer, provided the transferee executes a written instrument agreeing to be bound by the terms of this agreement, in a form acceptable to Company; provided, such transferee shall in any event be bound by the terms of this agreement.

13.4   Status of Transferee. Except for transferees receiving their Membership Interest pursuant to a transfer approved by the Developer Member and otherwise satisfying the requirements of paragraphs 13.1 and 13.2 above, the transferee of a Membership Interest shall be an assignee of an economic interest only, as provided in Section 17301 of the LLC Act. An assignee of an economic interest shall not be entitled to exercise any rights and powers of a Member, including the right to vote, and the assignee shall only be entitled to receive, in accordance with the terms of the transfer, the distributions and allocations the transferring Member otherwise would have received.

13.5   Withdrawal. Except as provided in Section 17252(b) of the LLC Act, no Member may withdraw or resign as a Member of the Company. In the event of an purported withdrawal or resignation, the Company shall not be dissolved.

13.6   Expulsion. Neither the Manager nor a Member shall have the right to expel a Member.

13.7   Bankruptcy. In the event of a bankruptcy of a Member, the bankruptcy estate of such Member shall be the holder of an economic interest only.

## 14.   OPTIONS TO PURCHASE AND SELL.

14.1   Peppertree's Option to Purchase. Upon recordation the final subdivision map for the Project, Peppertree shall have the option to purchase a portion of Morosetti's Membership Interest sufficient to result in each Investor Member holding a 30% Profits Percentage (the "Equalizing Percentage"). The Purchase Price shall be equal to a pro rata portion of Morosetti's then current Unreturned Capital and any accrued and unpaid Preferred Return on such Unreturned Capital (the "Purchase Price"). Such option shall be exercised by Peppertree delivering written notice to Morosetti within 30 days after recordation of the final map, along with the Purchase Price.

14.2   Morosetti's Option to Sell. Upon recordation the final subdivision map for the Project, Morosetti shall have the option to require Peppertree to purchase from Morosetti the Equalizing Percentage, for an amount equal to the Purchase Price, as both terms are defined in paragraph 14.1 above. Such option shall be exercised by Morosetti delivering written notice to Peppertree within 30 days after the recordation of the final map. If Morosetti exercises such option, Peppertree shall within 60 days after receipt of such notice deliver the Purchase Price to Morosetti.

## 15.   DISSOLUTION.

15.1   Events of Dissolution. The Company shall be dissolved upon the first to occur of the following events:

15.1.1 If a tentative subdivision map is not approved for the Project within 36 months after the date of this agreement ("Map Period"), Morosetti may unilaterally elect to dissolve the Company by delivering written notice to the other Members of such election within 90 days after the expiration of the Map Period. Upon such an election to dissolve by Morosetti, the Company, as part of the winding up and liquidation shall convey title to the Property to Morosetti.

15.1.2 An election to dissolve by Members holding a majority of the Profits Percentages.

15.1.3 If the Developer Member ceases to be a Member of the Company, unless the business of the Company is continued by a vote of a majority in interest (of both capital and profits) of the remaining Members, within 90 days of the occurrence of that event, and there are at least two remaining Members.

15.2    Winding Up and Liquidation. Upon dissolution of the Company, the Managers shall wind up the affairs of and liquidate the Company in accordance with applicable law and distribute the net proceeds of liquidation to the Members pursuant to this Agreement, subject to Paragraph 14.1.1 above.

15.3    Time for Liquidation. A reasonable time shall be allowed for the orderly liquidation of Company property and the discharge of Company debts, liabilities and obligations, so as to reduce the loss normally resulting from a liquidation.

15.4    Certificate of Dissolution of Company. Upon dissolution of the Company, the Managers shall execute, file, publish and record such certificates of dissolution and cancellation, tax returns and other documents and instruments as may be required under applicable law.

16.    AMENDMENT.

This agreement may be amended with the approval of the Developer Member and a majority in interest of Members holding Investor Interests; provided, however, no amendment may increase the duties or obligations of a Member without the approval of such Member.

17.    GENERAL PROVISIONS.

17.1    Notices. Except as otherwise provided in this Agreement, any notice or other communication given to any Member under this agreement or applicable law shall be in writing and shall be deemed duly given (i) on the date of delivery if personally delivered to the Member (if an individual) or to an executive officer or other authorized representative or of a Member (if an entity), or (ii) one business day after delivery if sent to a Member by facsimile, telegram or overnight courier to such Member's address as provided to the Company, or (iii) three (3) business days after mailing if sent by first class mail, postage prepaid, and properly addressed to the Member at such Member's address as provided to the Company, or such other address designated from time to time by such Member for this purpose.

17.2    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the heirs, beneficiaries, legal representatives, successors, assigns and personal representatives of the respective Members, subject to the restrictions on transfer contained in this Agreement.

17.3   _Severability_. If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

17.4   _Entire Agreement_. This Agreement contains the entire understanding among the Company and the Members and supersedes any prior written or oral representations, understandings and agreements between the Company and the Members with respect to the subject matter of this Agreement. Any purported modifications or amendments of this Agreement shall be of no force or effect unless contained in a subsequent written agreement signed by the Member(s) to be charged.

17.5   _Construction_. This agreement has been negotiated at arms length and each party has been or has had the opportunity to be represented by legal counsel. Accordingly, any rule of law (including California Civil Code Section 1654) or legal decision that would require interpretation of any ambiguities in this agreement against the party drafting it is not applicable and is waived. The provisions of this agreement shall be interpreted in a reasonable manner to effect the intent of the parties and the purpose of this agreement.

17.6   _Paragraph Headings_. The captions of the paragraphs in this Agreement are inserted as a matter of convenience and for reference only and in no way define, limit, extend or describe the scope of this Agreement or the intent of any of its provisions.

17.7   _Governing Law_. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

17.8   _Waiver_. The failure to enforce any provision of this Agreement shall not constitute a waiver thereof or the right to enforce such provision thereafter.

17.9   _Attorneys' Fees_. If any party institutes or is made a party to an action or proceeding to enforce or interpret this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the other party all reasonable attorneys' fees and costs (whether otherwise taxable or recoverable) incurred in connection with such action or proceeding, or any appeal or enforcement of such action or proceeding.

17.10   _Further Assurances_. The parties covenant and agree that they will execute such other and further instruments and documents as are or may become necessary or convenient to effectuate and carry out this Agreement.

17.11   _Counterparts_. This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument.

17.12   _Gender_. As used in this agreement, the masculine, feminine or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicated.

17.13   _Time_. Time is of the essence under this agreement.

18.  INVESTOR REPRESENTATIONS.

18.1  Representations and Warranties.   Each Member represents and warrants as follows:

18.1.1 Such Member is a bona fide permanent resident of the State of California.

18.1.2 Such Member knows of no public solicitation or advertisement conducted by the Company or any other person with respect to the offer and sale of Membership Interests.

18.1.3 Such Member is acquiring a Membership Interest for such Member's own account (or a trust account if such Member is a trustee) for purposes of investment and not with  a view to or for sale in connection with any distribution of the Membership Interests.

18.1.4 Such Member:

(i)    has a pre-existing personal or business relationship with the Developer Member; and

(ii)   has the capacity to protect such Member's own interests in connection with the purchase of Membership Interests, by reason of such Member's business or  financial experience.

18.1.5 Such Member has received, reviewed and understands this agreement or, to the extent such Member did not understand this agreement, such Member has obtained advice  from such Member's own independent advisors and, based upon such independent advice, such  Member fully understands this agreement and the risks associated with this investment.   Such  Member and/or such Member's independent advisors have had a reasonable opportunity to ask  questions of and receive answers concerning the Property, the Project, the Company and  Membership Interests, and all such questions have been answered to the satisfaction of such  Member.

18.2 Acknowledgments. Each Member acknowledges and agrees as follows:

18.2.1 Such Member understands the return on such Member's investment is determined solely by the terms of this Agreement and no additional return of such Member's investment has been guaranteed or assured.

18.2.2 Such Member understands that neither the Managers, the Developer Member nor any other person has guaranteed return of such Member's investment, or will be liable or responsible for any return of such Member's investment.

18.2.3 Such Member understands there will be no recognizable market for the resale or distribution of Membership Interests.

## 19. REPRESENTATION.

The parties acknowledge that this agreement has been prepared by Judkins, Gallagher & Bonanno, A Law Corporation ("Judkins"), who represents only Northern Capital, Inc. and Peppertree Land Company. All other Members acknowledge that they have been advised to seek advice from their own counsel in connection with this Agreement. Each of the Members agree that, following the execution of this Agreement, Judkins may from time to time perform legal services for the Company and, as a result of such services, shall not be deemed to represent or to owe any duty to any Member individually.

20.    <u>ALTERNATE DISPUTE RESOLUTION PROVISIONS</u>.

Any dispute, claim or other controversy arising under this Agreement or in connection with the Company, the Offering or the Property, including without limitation any dispute regarding the interpretation or enforcement of this Agreement and any claims asserted against a Member, Manager, Officer or an affiliate, agent or representative of a Member, Manager, Officer or affiliate (at the request of such person), shall be resolved pursuant to the Alternative Dispute Resolution Provisions attached as an Addendum to this Agreement.  All persons covered by this provision, if not a Member, shall be third party beneficiaries of this provision.

*DEVELOPER MEMBER:*

Northern Capital, Inc.,
A California corporation

By: _____
       Duane S. Urquhart, President

Address:     5256 S. Mission Road, #905
                   Bonsall, CA 92003

*INVESTOR MEMBERS:*

_____
Roland T. Morosetti  JR

_____
Arlene L. Morosetti

Address:    1181 HIGHLAND PARK
                   FALLBROOK, CA  92028

Peppertree Land Company,
a California general partnership

By: _____

By: _____

Address:    5256 S. Mission Road, #905
                   Bonsall, CA  92003

## ADDENDUM

### ALTERNATIVE DISPUTE RESOLUTION PROVISIONS

Mediation.    The parties shall first endeavor to resolve any claim, dispute or other controversy subject to this addendum ("Dispute") through mediation.  The mediation shall be conducted by an organization or individual selected by agreement of the parties or, failing such agreement, then by the San Diego offices of the American Arbitration Association ("AAA").  The complaining party shall contact AAA to schedule a mediation conference within thirty (30) days. The parties may agree on a mediator from the AAA panel.  If they are unable to agree, AAA shall provide a list of three available mediators and each party may strike one.  The remaining one will serve as the mediator.  Neither party may initiate arbitration proceedings until mediation is completed.

Arbitration.  Any Dispute not resolved through mediation shall be resolved by binding arbitration.  The arbitration will be conducted by an organization or individual agreed upon by the parties or, failing such an agreement, by the San Diego offices of AAA.  The parties may agree on an arbitrator from the AAA panel.  If they are unable to agree, AAA shall provide a list of three available arbitrators and each party may strike one.  The remaining one will serve as arbitrator. The arbitrator may be the same person who served as mediator.  The complaining party shall initiate arbitration by delivering a written demand for arbitration by personal delivery or by certified mail (return receipt requested) to all parties.  The demand must contain a description of the dispute, the amount involved, and the remedy sought.  The parties shall be permitted discovery, including the right to take depositions, under the supervision and rules set by the arbitrator

Consolidation.  To the maximum extent possible, the parties agree that any mediation or arbitration under this addendum be consolidated with other mediation or arbitration proceedings in which related issues are being resolved.  The parties agree to take all action necessary or desirable to achieve such consolidation.

Provisional Remedies.  This addendum shall not preclude the filing of a lawsuit or other judicial action to obtain pre-judgment remedies such as attachment, receivership or injunctions.

## PEPPERTREE LANE LLC

## FIRST AMENDMENT TO
## OPERATING AGREEMENT

This First Amendment ("Amendment") is entered into effective as of May 1, 2006 by Peppertree Land Company, a California general partnership ("Investor Member"), and Northern Capital, Inc., a California corporation ("Northern Capital" or the "Development Member"), and amends that certain Operating Agreement of Peppertree Lane dated July 1, 2002 (the "Operating Agreement").

1.     Paragraph 5.1.1 of the Operating Agreement is amended to provide as follows:

> 5.1.1    First to the holders of Investor Interests until they have received distributions equal to 7.5% per annum (cumulative but not compounded) on the Investors' Unreturned Capital outstanding from time to time (the "Investor Preferred Return").

2.     Paragraph 15.1.1 of the Operating Agreement is amended to provide as follows:

> 15.1.1  If a tentative subdivision map is not approved for the Project within 60 months after the date of this agreement ("Map Period"), Morosetti may unilaterally elect to dissolve the Company by delivering written notice to the other Members of such election within 90 days after the expiration of the Map Period.  Upon such an election to dissolve by Morosetti, the Company, as part of the winding up and liquidation shall convey title to the Property to Morosetti.

DEVELOPER MEMBER:

Northern Capital, Inc.,
A California Corporation

By:  _____
       Duane S. Urquhart, President

Address:    5256 S. Mission Road, #905
                    Bonsall, CA 92003

INVESTOR MEMBERS:

_____
Roland T. Morosetti, Jr.

_____
Arlene L. Morosetti

Address:     1181 Highland Park
                     Fallbrook, CA 92028


Peppertree Land Company,
A California general partnership

By: _____

By: _____

Address:  5256 S. Mission Rd., #905
                 Bonsall, CA  92003